RECEIVED

OCT 2 0 2017

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

SCOTTSDALE INSURANCE CO                     CIVIL ACTION NO. 6:15CV2664

VERSUS                                      UNASSIGNED DISTRICT JUDGE

TL SPREADER, LLC, ET AL.                    MAGISTRATE JUDGE HANNA

## MEMORANDUM RULING

Pending before the Court in this insurance coverage suit is a motion for summary judgment filed by plaintiff Scottsdale Insurance Company ("Scottsdale"). [Doc. 18] Pursuant to its motion, Scottsdale seeks judgment in its favor finding that Scottsdale owes no indemnity to its insureds, TL Spreader, LLC ("TLS") and Helena Chemical Company ("Helena") (collectively "defendants"), and dismissing all counterclaims brought against Scottsdale with prejudice and at defendants' cost. [Id.] For the following reasons, the motion is DENIED.

## I.     Factual Background[1]

Scottsdale issued a commercial general liability insurance policy to TLS, providing coverage for the period of March 27, 2014 to March 27, 2015. [Doc. 3, ¶ B] Helena is named as an "additional insured" on the CGL policy. [Doc. 18-5, p. 24] On or prior to May 6, 2014, Helena contracted with its customer Wild Farms to sell and apply certain herbicides and pesticides to Wild Farms' 123 acre conventional rice field in Acadia Parish, Louisiana. [Doc. 24-1, pp. 1-2] Helena subcontracted with TLS to perform the application services to Wild Farms' rice field. [Id. at 2] On or about May 6, 2014, the TLS employee tasked with applying the products failed to properly "neutralize" a chemical

---

[1]The facts as set forth above are construed in the light most favorable to defendants. *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010).

Known as "Newpath" in the spray rigor prior to performing his work. [Id.] Newpath should not be applied to convention rice such as the rice grown by Wild Farms. [Id.] TLS completed its work at Wild Farms on May 6, 2014, at which time all performance called for in Helena's contract with Wild Farms was completed. [Id. at 7] Approximately three days after completion of the spraying, the rice crop first began to exhibit physical damage in the form of abnormal stunting, lesions, yellowing and death. [Id.; Doc. 24-2, ¶3-6; Doc. 24-4, ¶ 5] Approximately six days after completion of the spraying, an abnormal amount of the rice crop's tillers began to die. [Doc. 24-2,¶ 7]

Thereafter, Wild Farms made a claim for crop damage allegedly incurred because of the misapplication of chemicals. [Doc. 3, p.14, ¶ F.] On or before May 27, 2014, TLS provided notice of this occurrence to Scottsdale. [Id. at ¶ G] Scottsdale denied coverage for the Wild Farms' claim on June 5, 2014. [Id. at ¶ I] TLS and Helena ultimately settled the claim of Wild Farms, with TLS paying Wild Farms $23,996.17 and Helena paying Wild Farms $23,981.73. [Id. at ¶ K,L]

Demand Quality, LLC, a co-tenant of Wild Farms, used the Wild Farms' property as well as nearby property to raise crawfish. [Doc. 24-1, p.4] At some point after completion of the work on Wild Farms' rice field, Demand Quality made demand on TLS and Helena for damage in the amount of $69,172.00 for reduced yields and physical damage to its aquatic crawfish crop, allegedly caused by the misapplication of chemicals to Wild Farms' rice field. [Doc. 18-4, pp. 9-10] On or before May 27, 2014, TLS notified Scottsdale of Demand Quality's crawfish claim. [Doc. 3, ¶ 3] Thereafter, Helena and TLS agreed to a settlement with Demand Quality, with Helena paying $69,172.00 for the damage to Demand Quality's crawfish crop. [Id. at Q].

On September 14, 2015, TLS and Helena made their final, formal demand on Scottsdale, requesting Scottsdale "indemnify TLS and Helena for the amount of $117,149.90, the total of the

settlement to Wild Farms and Demand Quality. . . ." [Id. at ¶ R] On November 10, 2015, Scottsdale

filed this suit for declaratory judgment, whereby it seeks a judgment declaring its insurance policy

affords no coverage for the rice claim or crawfish claim, and that TLS and Helena have no claim for

reimbursement against Scottsdale for the cost of the settlements paid for those claims. [Doc. 7, p.

9] Thereafter, TLS and Helena answered suit and filed a counterclaim seeking a judgment ordering

Scottsdale to reimburse TLS and Helena the amounts paid in settlement for the Wild Farms and

Demand Quality claims, and awarding bad faith penalties pursuant to La. R.S. 22:1973 and La. R.S.

22:1892.[2] [Doc. 3, pp. 19-20]

## II.     Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense - or the part

of each claim or defense - on which summary judgment is sought." Fed.R.Civ.P. 56(a). "The court

shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is material if proof of its

existence or nonexistence might affect the outcome of the lawsuit under the applicable governing

law. *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009). A genuine issue of

material fact exists if a reasonable jury could render a verdict for the nonmoving party. *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions,
documents, electronically stored information, affidavits or declarations, stipulations
(including those made for purposes of the motion only), admissions, interrogatory

---

[2] In their counterclaim, defendants additionally sought defense costs and penalties for
Scottsdale's failure to provide a defense for the underlying claims. [Doc. 3, pp. 18-19] However, in their
memorandum in opposition to Scottsdale's motion for summary judgment, defendants concede "they
have no claim against Scottsdale for a defense and for penalties or damages resulting from Scottsdale's
failure to defend them." [Doc. 24, p. 6; *see also id.* at 23] Accordingly, the foregoing claim is waived and
will not be addressed in this Ruling.

answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Id.* at § (c)(1).

As summarized by the Fifth Circuit:

When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

*Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994)(internal citations omitted).

In evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). To the contrary, "[i]n reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001).

### III.    Applicable Law[3]

The parties agree Louisiana law governs the interpretation of the CGL policy. "The interpretation of an insurance contract presents a question of law, rather than of fact, and therefore

---

[3]Jurisdiction over this matter exists pursuant to 28 U.S.C. § 1332. [Doc. Nos. 7, 14, 15; *see also* Doc. 17, p. 2]

is an appropriate matter for determination by summary judgment." *Martco Ltd. Partnership v. Wellons, Inc.*, 588 F.3d 864, 878 (5th Cir. 2009)(citing *Bonin v. Westport Ins. Co.*, 930 So.2d 906, 910 (La. 2006)). "An insurance policy is a contract between the insured and insurer and has the effect of law between them." *Gorman v. City of Opelousas*, 148 So.3d 888, 892 (La. 2014). "The role of the judiciary in interpreting an insurance contract is to ascertain the common intent of the insured and insurer as reflected by the words in the policy." *Id.* (quoting *Peterson v. Schimek*, 729 So.2d 1024, 1028 (La. 1999)); *see also* La. Civ. Code art. 2045. "When the words of an insurance contract are clear and explicit and lead to no absurd consequences, courts must enforce the contract as written and may make no further interpretation in search of the parties' intent." *Id.* (quoting *Peterson* at 1028); *see also* La. Civ. art. 2046. "The words of a contract must be given their generally prevailing meaning." La. Civ. Code art. 2047. "Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include." *Id.* at art. 2051. "In the case of doubt that cannot otherwise be resolved, a provision in a contract must be interpreted against the party who furnished its text." La. Civ. Code art. 2056.

As stated by the Louisiana Supreme Court:

> The purpose of liability insurance is to afford the insured protection from damage claims. Policies therefore should be construed to effect, and not to deny, coverage. Thus, a provision which seeks to narrow the insurer's obligation is strictly construed against the insurer, and, if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied.

> It is equally well settled, however, that subject to the above rules of interpretation, insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy.

*Reynolds v. Select Props., Ltd.*, 634 So.2d 1180, 1183 (La. 1994)(internal citations, footnotes omitted).

The insured bears the burden of proving a policy of insurance affords coverage for an incident. *Jones v. Estate of Santiago*, 870 So.2d 1002, 1010 (La. 2004). The insurer bears the burden of proving the applicability of an exclusionary clause within a policy. *Id.* "Summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded." *Id.*

## IV. Analysis

### A. Whether defendants have alleged "property damage" triggering the policy's initial grant of coverage

Turning to the language of the Scottsdale policy, the Court now determines whether defendants have alleged "property damage" sufficient to trigger the primary coverage provision of the policy. The primary coverage provision of the policy states the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." [Doc. 18-5, p. 8] The primary coverage provision further provides, "This insurance applies to 'bodily injury' or 'property damage' only if: . . . [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory' . . . during the policy period . . . ."[4] [Id.]

The parties do not dispute that TLS and Helena's liability to Wild Farms and Demand Quality arose out of an "occurrence" within the "coverage territory" during the policy period. Hence,

---

[4]"Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." [Id. at 22]

whether the insuring agreement provides coverage in this case turns upon: (1) whether defendants' claim for damages arises out of "property damage" as that term is defined in Scottsdale's policy, and if so, (2) whether Scottsdale's policy contains an exclusion explicitly excluding coverage for the claims made by Wild Farms and Demand Quality against TLS and Helena.

The Scottsdale policy defines "property damage" in pertinent part as follows:

a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

[Id. at 22]

Scottsdale argues the primary coverage provision of the policy affords no coverage for the incident giving rise to this suit, "because there was no 'property damage' to 'tangible property.'" [Doc. 18-2, p. 14] Although the policy does not define "tangible property," Scottsdale correctly notes Louisiana jurisprudence has found the term "tangible property" corresponds to the Louisiana concept of "corporeal property."[5] [Id. (citing *Selective Ins. Co. of Southeast v. J.B. Mouton & Sons, Inc.*, 954 F.2d 1075, 1079 (5th Cir. 1992))] According to Scottsdale, claims for the "hope of future income from crops" constitute intangible, incorporeal property, and as such, they are not covered under the policy. [Id. at 14-15 (internal quotation marks omitted)] Scottsdale reasons because "[t]here is no record evidence pointing to any physical crop damage or crawfish kills," and because "damages were calculated in terms of reduced crop yield," the rice claim and crawfish claim "are claims for lost

---

[5] "Corporeals are things that have a body, whether animate or inanimate, and can be felt or touched." La. Civ. Code art. 461. "Incorporeals are things that have no body, but are comprehended by understanding, such as the rights of inheritance, servitudes, obligations, and right of intellectual property." *Id.*

profits due to reduced yields–an incorporeal," and therefore the policy affords no coverage. [Id. at 16]

In response, defendants assert the underlying claims are for property damage to the rice crop and crawfish crop, both of which constitute tangible property. [Doc. 24, p. 7] According to defendants, "[t]he rice crop was physically injured when it first exhibited stunting, lesions, yellowing, and death on May 9, 2016 – after TLS sprayed the crop with 'Newpath.'" [Id. at 7-8 (emphasis omitted)] Defendants further contend "Wild Farms and Demand Quality also lost the ability to use the rice crop for commercially viable enterprises such as selling rice and producing crawfish." [Id. at 8] Likewise, defendants contend there was physical injury to the crawfish crop, as well as loss of its use, due to the application of Newpath to the rice field. [Doc. 39, pp. 2-3; *see also* Doc. 18-1, p. 3, ¶ 16; Doc. 18-4, pp. 9-10 ("Demand Quality claimed its crawfish crop . . . had been negligently damaged or destroyed as a result of an incident occurring on or about May 6, 2014 involving the misapplication of herbicides and/or pesticides . . . resulting in an overall reduced yield from its crawfish crop due to damaged or destroyed crawfish or crawfish habitat")]

For the reasons that follow, the Court finds coverage under the policy is triggered when applied to the undisputed material facts asserted in this matter. At the outset, the Court notes that it finds the cases cited by Scottsdale in support of its position that claims for lost profits constitute intangible property and therefore do not fall under a CGL policy's definition of property damage are distinguishable on their facts. Those cases address what some courts refer to as the "business risk doctrine" or "economic loss doctrine." *See e.g. Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 428 F.3d 193, 198 (5th Cir. 2005); *SMI Owen Steel Co., Inc. v. Marsh USA, Inc.*, 520 F.3d 432, 440-44 (5th Cir. 2008)(applying Nevada law); *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65,

75 (Wis. 2004). This doctrine holds that claims for indemnity involving solely economic losses do not trigger CGL coverage, because there is no physical injury to tangible property nor loss of use of tangible property. *Id.* However, where economic losses stem from physical injury or loss of use of tangible property, the "property damage" element is satisfied and coverage is available, assuming no policy exclusions apply. *See e.g.* 4 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., BRUNER & O'CONNOR CONSTRUCTION LAW § 11:233 (2017). Stated differently, "economic losses may be recovered as consequential damages from physical injury to tangible property but do not, in and of themselves, constitute property damage." *Farm Bureau Mutual Ins. Co. v. Earthsoils, Inc.*, 812 N.W.2d 873, 876 (Minn. Ct. App. 2012).

For example, in the primary case relied upon by Scottsdale, *Snug Harbor, Ltd. v. Zurich Ins.*, 968 F.2d 538 (5th Cir. 1992), the Fifth Circuit held no coverage was afforded under a CGL policy for a bank's misplacement of a petition against the former owner of a condominium project. The underlying claim was brought by a resident of the condominiums for injuries he sustained when stabbed by an employee of the condominium owner. *Id.* at 540. On the same day notice of the underlying suit was served on the owner of the condominiums, a bank/mortgage holder held a foreclosure sale and took possession of the condominiums, which purportedly led to the misplacement of the petition and citation, and ultimately the entry of a default judgment against the condominium owner. Examining an identical policy definition of "property damage," the Court found loss of use of the underlying citation and petition did not constitute "property damage" as defined by the policy. In arriving at its conclusion, the Fifth Circuit reasoned:

> Courts generally have interpreted property damage to require (1) actual damage to tangible property or (2) the loss of use of property with tangible monetary value. Courts have also held that purely economic losses—for example, loss of the use of money a claimant would have received but for the insured's negligence—do not

9

constitute "the loss of use of tangible property."

> . . . .

> The [underlying] petition and citation had no intrinsic value or use beyond notifying Snug Harbor that legal action had commenced against it. The substantive loss resulting from the alleged mishandling of this documentation is loss of that notice, which resulted in a default judgment. We find that, as a matter of law, such a loss does not constitute a property loss for CGL policy purposes.

*Snug Harbor* at 542 (footnotes omitted). The remaining cases cited by Scottsdale similarly address claims involving solely damages to intangible, economic interests. *See Selective Ins. Co. of Southeast v. J.B. Mouton & Sons, Inc.*, 954 F.2d 1075, 1078-80 (5th Cir. 1992) (loss of anticipated revenues from a failed partnership due to insured's actions did not state a claim for "property damage" as defined by CGL policy; partnership interest was intangible property and therefore losses did not result from physical injury to tangible property or from loss of use of tangible property); *Farm Bureau Mutual Ins. Co. v. Earthsoils, Inc.*, 812 N.W.2d 873, 876 (Minn. Ct. App. 2012)(Where underlying claim alleged insured sold plaintiffs deficient fertilizer that produced a lower than advertised corn crop, but made no allegations that the crop produced less than it would have without the fertilizer or that the corn cobs actually produced were damaged or unmarketable, the alleged loss was not caused by physical injury as required by the definition of "property damage" in the CGL policy); *Mid-Continent Cas. Co. v. Sullivan*, 2008 WL 5412835 (E.D. Ark. 2008)(Where underlying complaint alleged fertilizer company failed to spread fertilizer evenly, resulting in a loss of crop yield, and no claim was made for damage to the plants themselves, the claim was for breach of contract/faulty workmanship, which under Arkansas law is a foreseeable event, rather than an occurrence under a CGL policy).

By characterizing defendants claims as solely involving incorporeal, economic losses, Scottsdale ignores that in this matter, defendants have alleged physical injury to tangible property and loss of use of tangible property, out of which additional consequential damages flowed. Again, defendants contend application of Newpath to Wild Farms' rice field resulted in physical damage and loss of use of tangible property - *i.e.*, the rice crop and crawfish crop.[6] Both the rice crop and the crawfish crop are tangible/corporeal property.[7] Unlike the factual patterns of the cases relied upon by Scottsdale, in this matter the underlying claims allege physical injury to tangible property and loss of use of tangible property. Accordingly, the economic loss doctrine is inapplicable to the facts at hand.[8]

Finally, the Court notes the type or measure of damages is not dispositive of whether or not coverage is afforded; rather, the pertinent inquiry is whether there was an occurrence which resulted in "property damage" as defined in the policy. *See e.g. Ferrell v. W. Bend Mut. Ins. Co.*, 393 F.3d 786, 795 (8th Cir.2005)(damage to tomato crops in the form of stunted plants and diminished yield caused by defective plastic film purchased from insured constituted property damage under CGL policy; that damages at trial were measured in terms of lost profits was irrelevant to question of whether claim asserted property damage as defined in the policy); *see also Triple U Enterprises, Inc.*

---

[6] *See* Doc. 24-2, ¶¶ 3-7; Doc. 24-4, ¶ 5; Doc. 18-4, pp. 9-10.

[7] Examples of corporeals include "fruits, corn, . . . lands, meadows, [and] woods. . . ." 2 A.N. Yiannopoulos & Ronald J. Scalise, Jr., La. Civ. L. Treatise, Property § 2:15 (5th ed. 2015).

[8] *See e.g. Western Cas. and Sur. Co. v. Budrus*, 332 N.W.2d 837 (Wis. Ct. App. 1983)(Property damage was alleged where insured sold farmer mislabeled seeds, as farmer lost the use of his 40-acre field due to crop loss and loss of production during planting season); *Phibro Animal Health Corp. v. National Union Fire Ins. Co. of Pittsburgh*, 142 A.3d 761 (N.J. App. Div. 2016)(stunted growth to chickens caused by ingesting Aviax constituted "property damage"; alternatively, even if the chickens were not physically injured, their stunted growth resulted in a partial loss of their use because customers were unable to realize chickens' full potential for sale).

*v. New Hampshire Ins. Co.*, 576 F.Supp. 798 (D.S.D.1983), *aff'd* and *remanded*, 766 F.2d 1278 (8th Cir. 1985) (buyers of buffalo who brought claim against insured seller, alleging they were sold unfit breeding stock which led to "loss of expected calf crops" and diminution in value of calves born with brucellosis, stated a claim for physical injury to the calves which constituted property damage within the meaning of the CGL policy; that damages were pled as diminution or depreciation in value of the calves had no bearing on whether coverage was afforded under the policy); *Earthsoils* at 878 ("the difference between the anticipated crop yield and the actual crop yield may provide a measure of damages").

In this matter, defendants have pointed to evidence in the record showing there is an issue of material fact warranting trial, namely, whether the occurrence (*i.e.* the misapplication of Newpath) caused physical injury and/or loss of use of the rice crop and the crawfish crops. Regardless of how the underlying damages were calculated, the pertinent question as to whether coverage is available is whether there was "property damage" as defined in the policy. For the reasons set forth above, the Court finds Scottsdale has failed to show it is entitled to summary judgment in its favor as a matter of law under Section I, Coverage A, on the basis that "there was no 'property damage' to 'tangible property.'" [Doc. 18-2, p. 14] Having concluded defendants' claims for "property damage" trigger the initial grant of coverage under Scottsdale's insuring agreement, the Court turns to whether coverage is precluded by Exclusion (j)(6).

**B.    Whether Policy Exclusion (j)(6) Precludes Coverage**

Scottsdale contends Exclusion (j)(6) ("Damage To Property") precludes coverage "for corporeal property damage arising from the incorrect performance of TLS's work." [Doc. 18-2, p. 17]

The exclusion reads in pertinent part as follows:

This insurance does not apply to:

. . . .

j.      Damage To Property

      "Property damage" to:

      . . . .

      (6)      That particular part of any property that must be restored, repaired or replaced because "your work"[9] was incorrectly performed on it.

      . . . .

      Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

[Doc. 18-5, pp. 9, 11, 12]

The policy defines "Products-completed operations hazard" in pertinent part as follows:

"Products-completed operations hazard":

    a.      Includes all . . . "property damage" occurring away from premises you own or rent and arising out of . . . "your work" except:

    . . . .

    (2)      Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        (a)      When all of the work called for in your contract has been completed.

        . . . .

---

[9]"Your work" is defined in relevant part as: "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations." [Doc. 18-5 at 23]

&copy; When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

[Doc. 18-5, p. 22]

Exclusion (j)(6) applies "while the insured's work is in process, *i.e.*, the work is not yet completed."[10] *Supreme Servs. & Specialty Co. v. Sonny Greer, Inc.*, 958 So.2d 634, 641 (La. 2007). "On the other hand, the PCOH provision . . . applies only to property within that hazard after the work is completed." *Id.* "Under the PCOH provision, damages, other than the faulty product or work itself, arising out of the faulty workmanship are covered by the policy." *Id.* at 645; *see also Martco* at 881 (PCOH provision "allows for indemnification where 'property damage' to 'other property' arose from [insured's] product"); *Stewart Interior Contractors, L.L.C. v. Metalpro Industries, L.L.C.*, 969 So.2d 653, 668 (La. Ct. App. 4 Cir. 2007)("PCOH coverage applies to property damage arising out of the insured's product or work when all of the work in its contract is performed away from the insured's premises and has been completed, even if the product or work may need some correction, repair, or replacement").[11]

---

[10]The purpose of this exclusion "reflects the insurance company's intent to avoid the possibility that coverage under a CGL policy will be used to repair and replace the insured's . . . faulty workmanship." *Supreme Servs.*, 958 So.2d at 641(internal quotation marks omitted). "A CGL policy is not written to guarantee the quality of the insured's work or product." *Id.*

[11]The following example is illustrative of the PCOH provision:

[S]uppose the insured contracted to make and install a sign on a commercial building. After the work was completed, the sign fell due to defective installation, causing damage to the sign, the building's canopy and a parked car and also bodily injury to a pedestrian. The insurer covering the products-completed operations hazard would cover all claims for bodily injury and property damage except the contractor's

Accordingly, under the reasoning of *Supreme Services*, Scottsdale's policy extends coverage to defendants depending upon whether or not their work was completed at the time of the occurrence. Prior to completion, the policy unambiguously excludes coverage for all damages arising out of defendants' incorrectly performed work. However, once the work is completed, "a claim cannot fall within Exclusion (j)(6)," as the PCOH provision of the policy provides coverage for any damages caused by defendants' faulty work, except the cost to repair the faulty work itself. *Martco* at 880.

Scottsdale contends PCOH coverage is not available, because "the complained of damage occurred before TLS's work was completed." [Doc. 18-2, p. 19 (emphasis omitted)] According to Scottsdale, "Louisiana jurisprudence has not addressed the question presented here, *i.e.* when TLS's field spraying work was 'complete' for purposes of PCOH Coverage." [Doc. 18-2, p. 19] Accordingly, Scottsdale cites two non-binding cases to support its position: *Brake Landscaping & Lawncare, Inc. v. Hawkeye-Sec. Ins. Co.*, 625 F.3d 1019 (8th Cir. 2010) and *I.G.H. II, Inc. v. Selective Ins. Co. of S. Carolina*, 2007 WL 1378379, *4 (Ohio Ct. App.).

In *Brake*, an insured lawn care company brought suit against its liability insurers, seeking coverage for costs it incurred in resodding and reseeding its customers' lawns after its employee mistakenly sprayed the lawns with a non-selective herbicide. *Id.* at 1021. The employee applied the incorrect herbicide to its customers' lawns over an eight day period. *Id.* Once the incorrect herbicide was applied, it would "immediately begin[] to kill the plant, although actual plant death usually does

---

responsibility to repair and replace the sign, coverage for which would be excluded under the product and work exclusions.

15 WILLIAM SHELBY MCKENZIE & H. ALSTON JOHNSON, III, LA. CIVIL LAW TREATISE, INSURANCE LAW & PRACTICE § 6:9, n. 34 (4th ed. 2012); *see also Supreme Servs.* at 644.

not occur until seven to ten days later." *Id.* On the final day of his work, the employee discovered the mistake "and identified which properties had been affected by driving by customers' properties to see if their lawns were displaying signs of dead vegetation." *Id.* Affirming the trial court, the Eighth Circuit found Exclusion (j)(6) applied, because the damage to the lawns was caused by the insured's incorrect performance of its work. *Id.* at 1023. The court further found the PCOH exception to exclusion (j)(6) did not apply, because the property damage occurred prior to completion of the work. *Id.* at 1024.

*I.G.H.* involves a virtually identical fact pattern to *Brake*. In *I.G.H.*, an Ohio court rejected the insured's argument that the PCOH exception applied to Exclusion (j)(6) "because the grass did not immediately die." Rather, the Court found that "[a]lthough the grass did not instantly die, the grass could not recover from the . . . [insured's] application of [the non-selective herbicide]." *Id.* at *4. The opinion of the Ohio court gives no indication of when the damage was discovered (*i.e.*, during the work, or subsequent thereto).

> Based on the foregoing jurisprudence, Scottsdale concludes:
>
> PCOH Coverage does not apply to "[w]ork that has not yet been completed . . . ." If TLS's "work" was deemed "complete" under the Policy as soon as any single rice plant had been sprayed–as opposed to when an entire application contract is completed–the PCOH Coverage's temporal limitations would be impermissibly rendered "ineffective" and "superfluous."

[Id. at 21 (alterations in original; quoting Doc. 18-5, p. 22)]

Contrarily, defendants contend their work was completed at the time the damage occurred and therefore PCOH coverage is triggered. According to defendants, there is no need to look to non-binding jurisprudence to determine when TLS' spraying work was completed for PCOH coverage, as "Scottsdale's Policy defines when the work was "complete" for purposes of PCOH Coverage."

[Doc. 24, p. 16] Because "[a]ll of the spraying required by contract was complete on May 6, 2014," defendants contend under the plain language of the policy its work was complete on that date.  [Doc. 24, p. 16 (emphasis omitted)] Citing a leading Louisiana treatise, defendants argue coverage under the policy "is triggered when 'property damage' *occurs*, not when the spraying occurred." [Id. at 17 (emphasis in original)] According to the cited treatise, in order for coverage to be available under such policies, there must be an "occurrence" that causes property damage. However, it is not the occurrence that triggers coverage; rather, "coverage is triggered under the CGL policy in effect when that defect causes physical injury to tangible property (*e.g.*, the roof leaks or the wall collapses)." 15 WILLIAM SHELBY MCKENZIE & H. ALSTON JOHNSON, III, LA. CIVIL LAW TREATISE, INSURANCE LAW & PRACTICE § 6:5 (4th ed. 2012) (citing ISO Commercial General Liability Form, Section I(1)(b)(2)).

The Court agrees with defendants' position that coverage in this matter was not triggered until the property damage manifested. There are two prevailing theories under Louisiana law as to "whether an 'occurrence' occurs during a policy period of insurance coverage," to wit: the exposure theory (upon which Scottsdale implicitly relies) and the manifestation theory (upon which defendants rely). *Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*, 79 So.3d 246, 278, n.75 (La. 2011). As explained by the Louisiana Supreme Court in *Eagle Pipe*:

> Under the exposure theory, damage would be considered to have occurred when the act which resulted in the damage took place, not when the damage was discovered. Thus, where damage develops over a period of time from continuous or repeated exposure to injurious conditions, courts have determined that the occurrence took place either at the inception of the exposure period or continuously during the entire course of exposure, as in asbestos cases. Even where the damage or injury was not manifested until after an insurer's policy period, if the insurer's policy period fell either at the inception or during the course of exposure, the insurer would be liable.

> Under the manifestation theory, property damage would be considered to have occurred when it became manifest, regardless of when the act from which it resulted occurred.

*Id.* (citations omitted). While the Louisiana Supreme Court has not specifically adopted either theory in the context of commercial general liability policies, the clear weight of authority in more recent cases adopts the manifestation theory. *See Rando v. Top Notch Properties, L.L.C.*, 879 So.2d 821, 833 (La. App. 4 Cir. 2004); *Oxner v. Montgomery*, 794 So.2d 86, 92-93 (La. App. 2 Cir. 2001); *Clarendon America Ins. Co. v. Southern States Plumbing, Inc.*, 803 F.Supp.2d 544, 548 (W.D.La. 2011); *XL Specialty Ins. Co. v. Bollinger Shipyards, Inc.*, 57 F.Supp.3d 728, 751 (E.D.La. 2014); *Liberty Mut. Ins. Co. v. Jotun Paints, Inc.*, 555 F.Supp.2d 686, 696-97 (E.D.La. 2008).[12]

In this matter, defendants' work was complete on May 6, 2014, at which time Wild Farms and Demand Quality had a reasonable expectation of full use of the rice field. Defendants have pointed to evidence in the record showing the damage to the rice crop did not manifest until several days after completion of the work. [Doc. 24-2, ¶¶ 3-7] Unlike the *Brake* case cited by Scottsdale where the damages were discovered prior to completion of the work, in this matter there is evidence supporting defendants' position that the property damage was not discovered until several days after completion of all work called for under the contract. Again, Scottsdale "bears the burden of proving the applicability of an exclusionary clause within a policy." *Estate of Santiago*, 870 So.2d at 1010. By its own terms, Exclusion (j)(6) "does not apply to 'property damage' included in the 'products-completed operations hazard.'" [Doc. 18-5, p. 12] As defendants have pointed to evidence in the record supporting their position that the property damage did not occur until all of the work called for in TLS's contract had been completed, the Court finds Scottsdale has failed to carry its burden and show Exclusion (j)(6) negates coverage in this matter.

---

[12]Indeed, Scottsdale has successfully argued application of the manifestation theory to its CGL policies in other cases when application of that theory was favorable to Scottsdale. *See e.g. Landry v. Williamson*, 2015 WL 2093658 (La. Ct. App. 1 Cir. 2015).

## C.    Whether Coverage Is Available to Helena As an Additional Insured

Scottsdale contends the policy provides no coverage to Helena as an additional insured, because the additional insured endorsement allows coverage to Helena only for liability for property damage arising out of TLS's acts or omissions, or the acts or omissions of persons acting on TLS's behalf. [Doc. 18-2, p. 22] Scottsdale reasons because the policy affords no coverage to TLS (by virtue of Exclusion (j)(6)), the additional insured endorsement is not triggered, and therefore Helena has no coverage for the underlying claims. [Id. at 23-24] As the Court has found Exclusion (j)(6) is inapplicable under the facts of this case, the Court finds Scottsdale has not shown summary judgment in its favor is warranted with regard to Helena's claim for indemnification.[13]

## D.    Whether Dismissal of Defendants' Claim for Bad Faith Penalties Is Warranted

Scottsdale seeks dismissal of defendants' claims for penalties under La. R.S. 22:1892 and 1973. La. R.S. 22:1892 sets forth various duties imposed upon insurers with regard to payment and adjustment of claims, including: (1) a duty to "pay the amount of any claim due an insured within thirty days after receipt of satisfactory proof of loss"; (2) a duty to "initiate loss adjustment of a property damage claim . . . within fourteen days after notification of loss by the claimant"; and (3) a duty to "make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim." La. R.S. 22:1892(A).

---

[13]The Court notes that the Additional Insured Endorsement would appear to preclude coverage for "'property damage' occurring after: . . . [a]ll work . . . on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed." [Doc. 18-5, p. 24] In other words, it appears the policy does not provide PCOH coverage for additional insureds. *See e.g. Carl E. Woodward, L.L.C. v. Acceptance Indem. Ins. Co.*, 743 F.3d 91, 99, 102 (5th Cir.2014)(under Mississippi law, insurer had no duty to defend additional insured, as additional insured endorsement excluded property damage occurring after all work has been completed); *Rubin v. Brookshire Grocery Co.*, 2014 WL 949843, 7-9 (W.D.La.); *Chatelain v. Fluor Daniel Const. Co.*, 179 So.3d 791, *9-10 (La. App. 4 Cir. 2015). However, as Scottsdale did not raise this exclusion in its briefing, the Court assumes it is inapplicable to this matter.

Failure to comply with duties (1) and/or (3) "shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater," provided such failure "is found to be arbitrary, capricious, or without probable cause." *Id.* at (B)(1). Failure to comply with duty (3) exposes an insurer to the penalties set forth in La. R.S. 22:1973. *Id.* at (A)(3).

La. R.S. 22:1973 provides that an insurer owes its insured "a duty of good faith and fair-dealing," and has "an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured." La. R.S. 22:1973(A). "Failing to pay a settlement within thirty days after an agreement is reduced to writing[,] . . . [f]ailing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause[, and] [f]ailing to pay claims pursuant to R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause" each constitute a breach of the insurer's duties under this statute, "if knowingly committed or performed by an insurer." *Id.* at (B). An insurer who breaches the foregoing duties is exposed to "damages to which the claimant is entitled for breach of the imposed duty," as well as "penalties . . . in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater." *Id.* at (C).

Scottsdale contends defendants' claims for statutory penalties pursuant to La. R.S. 22:1892 and La. R.S. 22:1973 must be dismissed, because "there is no possibility of coverage under the Policy." [Doc. 18-2, p. 28] In its reply brief Scottsdale adds, "If the Court determines that coverage fails under the Policy, by definition Scottsdale did not act arbitrarily or capriciously, thus foreclosing on an element of Defendants' *prima facie* case and mooting their claims" [Doc. 38, p. 10] No other

argument is asserted by Scottsdale as to the inapplicability of the penalty provision statutes.

Because the Court has found Scottsdale has failed to show there is no possibility of coverage under the Policy, summary judgment in its favor on the penalty claims is not warranted on the grounds argued.[14]

## V.    Conclusion

For the reasons set forth above, the motion for summary judgment filed by Scottsdale Insurance Company [Doc. 18] is DENIED in its entirety.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 19 day of October, 2017.

UNITED STATES DISTRICT JUDGE

---

[14]Likewise, Scottsdale has failed to carry its burden and show that dismissal of defendants' "Civil Code article 1997 claim" is warranted on the basis that defendants have not shown there was a "breach of contract." [Doc. 18-2, p. 29] As set forth above, Scottsdale has failed to show there is no possibility of recovery under the CGL policy. Regardless, La. Civ. Code art. 1997 does not set forth a "claim" or "cause of action" which could be dismissed. Rather, this codal article sets forth the measure of damages where an obligor is found to be in "bad faith." La. Civ. Code art. 1997 ("An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.") Whether any failure to perform by Scottsdale was done in bad faith is an issue reserved for trial.